

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-18-00066-CV

**IN THE INTEREST OF K.R.S., ET AL.**

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2016-PA-01563
Honorable Antonia Arteaga, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Karen Angelini, Justice
                Patricia O. Alvarez, Justice
                Irene Rios, Justice

Delivered and Filed:  August 1, 2018

AFFIRMED

Mother[1] appeals the trial court's order terminating her parental rights to her five children,

K.R.S., D.W.G.III, D.W.G., A.B.S., and A.S.[2]  The only issue presented by Mother is whether the

evidence is legally and factually sufficient to support the trial court's finding that termination was

in the children's best interest.  We affirm the trial court's order.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, we refer to the mother as "Mother," the fathers by their first names, and the children by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

[2] The trial court's order also terminated the parental rights of Kernard, the alleged father of K.R.S. and those of Alvin, the father of A.B.S. and A.S.  The trial court's order did not terminate the parental rights of D.W.G.III's and D.W.G.'s father, Dwayne.  Only Mother appeals.

## BACKGROUND

On July 20, 2016, the Texas Department of Family and Protective Services ("the Department") filed its original petition to terminate Mother's parental rights following a "Priority I" referral received on July 19, 2016 alleging the four older children, K.R.S., D.W.G.III, D.W.G., and A.B.S.,[3] "were observed outside unsupervised and not dressed appropriately." Additionally, one of the boys was observed with an untreated burn on his back and neck. Also on July 19, 2016, the Department received a second "Priority I" referral alleging A.B.S. was treated at the hospital for a head injury alleged to have occurred from a fall from a bed. However, because the parents provided conflicting descriptions of how the accident occurred, hospital officials contacted the Department.

Department Caseworker Katherine Dix investigated the referrals. Dix discovered that D.W.G. had an approximately four-inch burn on his right shoulder that was blistered, uncovered, and untreated. During trial, Dix testified the burn appeared infected. Dix learned D.W.G. was burned by the hot insides of a pizza roll that K.R.S. dropped on D.W.G. when the eldest child was "in charge" of her younger siblings and making them something to eat. Dix also observed a "softball size knot" on A.B.S.'s head and a bruise on the left side of the child's forehead, which were allegedly caused when A.B.S. fell from standing on a bed to a tile floor.

Dix indicates in her affidavit that Alvin, the father of A.B.S. and A.S., was present when the child was injured. According to Dix, Mother had previously been moved from "Housing" because of harassment and threats by Alvin and a safety plan was in place that he have no contact with the children because of ongoing domestic violence. Dix testified the Department was

---

[3] A.S. was born in November 2016, after the filing of the original petition, which identified K.R.S., D.W.G.III, and D.W.G. as the children subjects of the suit. The Department filed its first amended petition on December 1, 2106, which added A.S. as a child subject of the suit.

concerned with the numerous complaints from other housing residents about fighting. Per the safety plan, the children's maternal grandmother was supposed to monitor the contact between Mother and the children and not allow Alvin into the home.

During the bench trial, Dix testified that prior to the July 19, 2016 referrals, the Department received a referral on March 30, 2016 alleging domestic violence between Mother and Alvin. During the investigation of that referral, Dix spoke with K.R.S., who related to Dix that Mother and Alvin were fighting and she witnessed Alvin hit Mother in the face with a shower rod. Dix testified the Department received three additional referrals alleging drug abuse and physical abuse between March 2016 and July 2016. Dix specifically referred to a May 9, 2016 referral relating to a "gash" across Mother's eye that required stitches and a June 29, 2016 referral regarding a fire at Mother's home for which Alvin was an arson suspect.

At the time of the instant referrals and petition, the Department had an open case in which the Department received a referral in October 2015 alleging neglectful supervision against Mother regarding the three older children. The Department received referrals on December 3, 2015 and December 4, 2015 alleging Mother tested positive for cocaine when she was admitted to the hospital for a miscarriage. According to Dix's affidavit, during the open case, the Department received a total of six referrals regarding the safety of the three older children. Additionally, on July 8, 2016, Mother's drug test results returned as positive for the use of cocaine and marijuana.

Dix's affidavit chronicles Mother's history with the Department apart from the instant case and the open case discussed above. In October 2007, the Department received a referral alleging physical neglect. Mother worked with the Department's family based services from February 2008 to October 2008 and participated in a parenting class due to concerns regarding her use of marijuana while pregnant. In August 2009, the Department received a referral for neglectful supervision, and Mother attended parenting classes for concerns about the home environment and

relating to her partner's[4] drug use. In August 2011, the Department received a referral alleging physical abuse, and Mother worked with family based services from May 2011 to April 2012 because of concerns relating to marijuana use during pregnancy. In the affidavit, Dix noted that Mother "continues to receive intakes for concerns of domestic violence and drug use."

The CASA volunteer, who had been assigned to the case since August 2016, testified K.R.S. expressed that she wanted to stay in her foster home, which is a foster-to-adopt situation. The volunteer related that K.R.S. feels safe and has developed a relationship with her foster family. Counselor Carrie Schindler-Shuetz, who held family counseling sessions, described the children as very happy to see their parents and specifically described A.S.B. as possessive of Alvin. Schindler-Shuetz testified she did not witness any apprehension on the part of the children for being with Mother and Alvin. Counselor Victoria Caylor testified D.W.G.III expressed to her that he wanted to reside with Dwayne. Department caseworker Veronica Hewtty, whose involvement in the case began in December 2016, oversaw D.W.G.III's and D.W.G.'s visits with Dwayne out of State. Hewtty testified both children were in favor of living with their father. Hewtty additionally testified that A.B.S. and A.S. are bonded with their foster mother and that K.R.S. related to her that she wanted to stay in her foster home.

Hewtty also testified regarding Mother's drug history. Hewtty related that Mother tested positive for marijuana at the time of the birth of a now-deceased child in April 2011. Mother also tested positive for the use of cocaine and marijuana in December 2015 when she gave birth to a stillborn child. Mother also tested positive for the use of cocaine and had a blood-alcohol content of 0.106 during her pregnancy with A.S. in October 2016. Mother also tested positive for the use of opiates at A.S.'s birth on November 25, 2016. Mother testified that she had been prescribed

---

[4] Mother's partner at that time was D.W.G.III's and D.W.G.'s father, Dwayne.

medication containing codeine and it was that medication for which she tested positive. On June 27, 2017, Mother's hair follicle test result was positive for drug use. Hewtty acknowledged Mother completed drug counseling at one point but then relapsed. Hewtty testified she "re-referred" Mother for drug counseling, but Mother was a "no show" in August, September, and October of 2017.

The Department also presented evidence of the domestic violence that occurred between Mother and Alvin. On October 11, 2016, San Antonio Police Department Officer Yolanda Sandoval responded to the report of an assault in progress. Sandoval testified that when she arrived at the scene, Mother stated Alvin hit her. Sandoval learned Mother was 33 weeks pregnant and observed Mother smelled of alcohol and had a bloodied lip and ear. Sandoval testified Mother told her that Alvin forced her to drink alcohol. Former Department caseworker Brooke Gehl testified Mother gave Gehl a false account of how her jaw was broken. Gehl related that Mother stated she had been in a car accident. Gehl further testified that Mother denied any sort of physical violence between her and Alvin. Hewtty testified that, according to a police report, on December 7, 2016, Alvin poured beer on Mother, and in response, Mother threatened Alvin with a knife.

At the time of the trial, Mother was twenty-eight years' old, and she testified she had been using illegal drugs since she was sixteen, but stated she did not start using cocaine until she was in her twenties. Mother admitted the children witnessed domestic violence between her and Alvin, but denied K.R.S. witnessed Alvin hit her with a shower rod. Mother testified she was never hit with a rod and that her injuries were caused by a fall in the tub. Mother acknowledged Alvin pushed her once and broke her jaw by hitting her with his fist. Mother denied any other reports of physical violence between her and Alvin.

Mother testified she completed her service plan. Mother specifically testified regarding her parenting class and drug counseling, which she credited with teaching her self-control. Mother

additionally testified she had stable housing, but acknowledged it was with Alvin and that they had changed apartments at least twice. Jeffrey Hernandez, an apartment manager, testified Mother broke her lease in November 2017, which was two months before trial. Hernandez further testified that a microwave was taken from the apartment when Mother vacated it and the apartment door was damaged from being kicked in.

Mother further testified she had been working at a call center for approximately four months and had been previously employed but at a lower paying job. Mother testified her drug tests resulted in negative results. However, on cross examination, Mother asserted it was her testimony that she had not used cocaine in over a year despite hair follicle tests indicating positive results for the use of cocaine, with the most recent being in December 2017 – the month before trial. Mother also testified she completed the reunification class and took part in visitation until the Department stopped the visitation schedule. Mother informed the trial court she was prepared for the children to return home with her.

After considering all the evidence and the parties' arguments, the trial court terminated Mother's parental rights to her children, K.R.S., D.W.G.III, D.W.G., A.B.S., and A.S. This appeal followed.

## STANDARD OF REVIEW AND STATUTORY REQUIREMENTS

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. §§ 161.001, 161.206(a) (West Supp. 2017); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). In this case, the trial court found evidence of three predicate grounds to terminate

Mother's parental rights and also found termination of Mother's parental rights was in the best interest of the children.[5]

When reviewing the sufficiency of the evidence, we apply the well-established standards of review. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency).

### BEST INTERESTS

In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Family Code section 263.307(b). *See* 263.307(b). We also apply the non-exhaustive *Holley* factors to our analysis.[6] *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Evidence that proves one or more statutory ground for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best interest analysis may consider circumstantial evidence, subjective

---

[5] The trial court found evidence Mother

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children[;] … engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children[;] … and used a controlled substance … in a manner that endangered the health or safety of the children, and (1) failed to complete a court-ordered substance abuse treatment program[,] or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (P).

[6] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013).

factors, and the totality of the evidence as well as the direct evidence." *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### Discussion

At the time of the trial, the children were ten, eight, five, and two years' old and fourteen months' old, respectively. The trial court heard testimony that ten-year-old K.R.S. wanted to remain in her foster home and that D.W.G.III and D.W.G. wanted to live with their father. The two youngest children were unable to express their desires, but there was evidence the children bonded with their foster parents and were well-cared for by their foster parents. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (factfinder may consider whether children have bonded with foster family and are well-cared for when children are too young to express their desires).

The Department presented evidence of Mother's history of drug use, which included illegal drug use during pregnancy and testing positive for the use of cocaine the month before trial. *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("A parent's drug use supports a finding that termination is in the best interest of the child."). Additionally, Hewtty testified Mother failed to complete ordered drug counseling following a relapse. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (evidence that the appellant failed to comply with the court-ordered service plan supported the trial court's best-interest determination). Further, the Department presented evidence of the physically violent relationship between Mother and her partner. *In re O.N.H.*, 401 S.W.3d 681, 685-86 (Tex. App.—San Antonio 2013, no pet.) (considering evidence of domestic violence as relevant to a child's best interest).

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re H.R.M.*, 209 S.W.3d at 108; *In re J.P.B.*, 180 S.W.3d at 573; *see also generally In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (recognizing an appellate court need not detail the evidence if affirming a termination judgment).

## CONCLUSION

We affirm the trial court's order terminating Mother's parental rights.

Irene Rios, Justice